John P. Sivick,               :
             Petitioner       :
                                :
               v.              :
                                :
State Ethics Commission,        :     No. 252 C.D. 2018
             Respondent     :     Argued: December 11, 2018


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                             FILED: January 3, 2019


       John P. Sivick (Sivick) petitions for review of the State Ethics Commission's (Commission) February 1, 2018 final adjudication and order,[1] wherein the Commission concluded that Sivick violated Section 1103(a) of the Public Official and Employee Ethics Act[2] (Ethics Act), Section 1104(d) of the Ethics Act,[3] and Section 1105(a) and 1105(b)(5) of the Ethics Act,[4] and ordered Sivick to make restitution in the amount of $30,000.00 and amend his Statements of Financial Interests (SFI) for the years 2011 and 2014. Sivick presents four issues for this Court's review: (1) whether the Commission erred by ruling that Sivick violated Section 1103(a) of the Ethics Act when, as Lehman Township[5] (Township) Supervisor (Supervisor) and Public Works Director, he engaged in activity for the purpose of encouraging the Township to repeal its nepotism policy and hire his son, J.

---

[1] The order is Commission Order No. 1731. It was mailed on February 8, 2018.
[2] 65 Pa.C.S. § 1103(a).
[3] 65 Pa.C.S. § 1104(d).
[4] 65 Pa.C.S. § 1105(a), 1105(b)(5).
[5] Lehman Township is located in Pike County, Pennsylvania.

Justin Sivick (Sivick's Son); (2) whether Sivick's participation in verifying Township payroll records for Township employees, including Sivick's Son, constituted a prohibited conflict of interest in violation of Section 1103(a) of the Ethics Act; (3) whether Sivick violated Section 1105(a) and 1105(b)(5) of the Ethics Act when he omitted certain information in his 2011 and 2014 SFIs; and (4) whether the Commission erred by ordering restitution. After review, we affirm.

The Township is a second class township with a three-member Board of Supervisors (Board). Sivick served as a Board member from January 1994 until December 2017, and as Board Chairman since 2004. Sivick has also held the full-time Roadmaster position since 1995. In 2005, the Board assigned him the additional responsibilities of Public Works Director. Other Supervisors during the subject time periods included Richard C. Vollmer (Vollmer), Robert H. Rohner (Rohner) and Paul D. Menditto (Menditto). Vollmer became a Supervisor on July 5, 2000 and, at the time of this proceeding, was serving his third term.[6] Vollmer has been Board Vice Chairman since January 2004. Rohner, who had been Township Secretary/Treasurer since 1995, became a Supervisor in January 2014. Menditto served as a Supervisor from January 2004 through January 2014, when he resigned his position following his election as a Magisterial District Judge. Rohner replaced Menditto on the Board.

In 2009, Menditto substantially upgraded the Township's existing 3-page employee pamphlet to an employee handbook (Handbook), which included detailed rules and regulations and contained a policy that prohibited the hiring of an individual if that person would supervise or be supervised by a member of the

---

[6] The Second Class Township Code (Code), Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§ 65101-68701, provides that Supervisors shall be elected to serve a 6-year term. *See* Section 403 of the Code, *as amended,* 53 P.S. §65403, added by Section 1 of the Act of November 9, 1995, P.L. 350.

person's immediate family (Nepotism Policy).[7]  The Board approved the Handbook, including the Nepotism Policy.

The Township did not have a formal hiring process, and Sivick conducted all of the Township's hiring.  In late 2012, Sivick verbally expressed to his fellow Supervisors in one-on-one discussions that he wanted the Township to employ his Son.  During these conversations, Sivick and the other Supervisors acknowledged that the Nepotism Policy would need to be removed from the Handbook before Sivick's Son could be hired.[8]  Menditto, in consultation with the Supervisors, including Sivick, revised the Handbook to remove the Nepotism Policy.  On January 7, 2013, at a Township reorganizational meeting, Menditto moved to approve the "employee benefits and information," that included the revised Handbook without the

---

[7] The Nepotism Policy defined "immediate family" as "one's spouse, parent, son or daughter, sister or brother, grandparent or grandchild."  Reproduced Record at 94a-95a.

[8] Rohner testified that in the fall of 2012, Sivick told him, "I want to hire my [S]on[, so] we need to change the [Handbook]."  R.R. at 127a.  Rohner opined that Sivick did not present the Handbook change and hiring of Sivick's Son as a suggestion, but rather as a directive.  *See* Reproduced Record (R.R.) at 128a.  "Rohner stated that . . . **Sivick was the Township Supervisor who primarily ran things at the Township, and if he wanted things done**[,] **they got done.**"  Commission Adj. at 10, ¶ 33(b)(1) (emphasis added).  Vollmer testified:

> In late 2012, [Sivick] came and he said 'look[,]' he says[,] 'I'd like to somebody [sic] maybe have my [S]on work here' . . . also in our [H]andbook we have a thing about hiring employees you know like relatives and . . . I questioned him on it.  I said look, I said 'do you really think that's a good idea?'  I said 'because a lot of time you know a father can't work with his son.'  Now I don't [sic] know [Sivick's Son] at this time.  So [Sivick] proceeds to tell me that in the past there have been [S]upervisors who had their families working in there etc.  And I know this is true . . . But anyway that wasn't the reason so I asked him.  I said 'are you absolutely sure?'  I said you know.  So he talked it up and I said and I had mixed emotions I really did.  I was one way or the other and I said alright look I said 'but you know it's in the [Handbook] and all' and he said we[]ll we're going to have to change the [Handbook] then.'  So anyway I agreed I said okay we'll change the [Handbook].

R.R. at 156a-157a.

3

Nepotism Policy.[9]  Vollmer seconded Menditto's motion, and it was approved. Although present at the meeting, Sivick abstained from voting on the revision as instructed by the Township's Solicitor.  Despite the Board's general practice of preparing an errata sheet reflecting Handbook changes, Sivick told Menditto not to prepare an errata sheet, and no errata sheet was created.

As Roadmaster, Sivick coordinated and scheduled training classes for Township road crew employees.  On March 20, 2013, Rohner submitted a registration form on the Township's behalf enrolling six individuals in a traffic control flagger training course that the Pennsylvania Department of Transportation mandated for individuals with flagging duties.  Although Sivick's Son had not yet applied for Township employment, his name was among those included in the Township's flagger course enrollment form.  The Township submitted payment of $300.00 reflecting a $50.00 enrollment fee for each enrollee.  On the same date, Sivick issued a $50.00 check to the Township wherein the memo line read: "Flagging Class."  Reproduced Record (R.R.) at 172a.

On June 3, 2013, Sivick's Son applied for Township employment in public works maintenance.[10]  In early June 2013, Sivick again approached the Supervisors about hiring his Son.  Although both Vollmer and Menditto admitted that they voted to approve Sivick's Son's employment at a June 2013 meeting,[11] June

---

[9] The meeting minutes do not reflect that the Nepotism Policy was removed.  Rather, the minutes reference the Supervisors approving "the employee benefits and information[,]" and further document that Sivick abstained from voting.  R.R. at 190a.

[10] Sivick's Son checked a box on the employment application to indicate that he had a relative employed by the Township, but did not provide information requested therein to identify the relative, the relative's relationship to him, or the relative's position with the Township.

[11] Menditto testified: "I don't recall ever being asked an opinion on whether we should hire a certain person or not."  R.R. at 143a.  Record evidence reflects that Sivick's Son was the only Township employee hired by a Board vote.  Rohner testified that, although Vollmer and Menditto officially moved to hire Sivick's Son, "[Sivick] was the one who wanted him hired."  R.R. at 125a.

4

2013 Township meeting minutes do not reflect an official Board vote approving Sivick's Son's hiring.[12]

Sivick's Son began Township employment on June 10, 2013. His initial pay rate was $15.00 per hour for regular work hours and $22.50 for overtime. The starting pay rate was consistent with pay rates for new Township employees. In 2014, Sivick's Son's regular pay rate was $16.20 per hour and his overtime rate was $24.30. In 2015, his regular pay rate was $17.45 and his overtime rate was $26.18. In 2016, his regular pay rate was $18.20 and his overtime rate was $27.30.

Township road crew employees completed time sheets, upon which they were paid. Sivick's duties included reviewing, verifying and signing the time sheets and forwarding them to the Township's administrative secretary and Secretary/Treasurer for additional review before paychecks were issued.

The Township employed Sivick's Son for 81 pay periods from June 2, 2013 to July 9, 2016, during which time his gross earnings totalled $126,552.24 (he netted $87,949.36). The Township discharged Sivick's Son's on June 30, 2016.

---

[12] In his brief, Sivick cites to and relies upon statements contained in a February 3, 2016 Investigative Division Report of Interview prepared by Joseph Sherbaum (Sherbaum) regarding his interview of Rohner that day. Notably, Sherbaum's February 8, 2016 Investigative Division Report of Interview references a phone call from Rohner **subsequent to** his February 3, 2016 interview as follows:

> I had sensed that **Rohner had not been as forthcoming with information** . . . **and that Rohner seemed to be uneasy due to the presence of** [Township] **Solicitor, Robert Bernathy, at said interview.** After that interview, I had told Rohner that he may call or email me at any time with additional information. **Rohner called on his own volition** to provide additional information . . . .
>
> . . . .
>
> **Rohner stated that the road crew position that** [Sivick's Son] **had obtained with the Township in June 2013 was created by** [Sivick] **specifically for** [his Son] . . . .

R.R. at 112a (emphasis added).

5

On November 15, 2015, the Commission's Investigative Division (Investigative Division) received a signed, sworn complaint wherein it was alleged that Sivick had violated the Ethics Act. On January 19, 2016, the Investigative Division initiated a preliminary inquiry and, thereafter, a full investigation, and notified Sivick accordingly. On September 13, 2016, the Investigative Division mailed Sivick an Investigative Complaint/Findings Report, to which Sivick filed an answer on November 12, 2016. The parties filed a Stipulated Record in lieu of an evidentiary hearing and filed briefs. On February 1, 2018, the Commission issued its final adjudication, wherein it determined that Sivick violated the conflict of interest provisions of Section 1103(a) of the Ethics Act, that Sivick filed timely but deficient SFIs for calendar years 2011 and 2014 in violation of Section 1105(a) and 1105(b)(5) of the Ethics Act, and that Sivick violated Section 1104(d) of the Ethics Act because he received compensation from the Township when he did not have accurate and complete SFIs on file with the Township. Specifically, the Commission ruled:

> [Sivick] used the authority of his public positions for the private pecuniary benefit of his [S]on . . . when he participated in discussions and actions of the Board to eliminate the Township's Nepotism Policy with the intent and for the purpose of having his [S]on hired as a Township road crew employee; when he discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of his [S]on as a Township employee; and when he verified Township records enabling and/or otherwise directing the payment of salary/wage to his [S]on from public monies.
>
> . . . .
>
> [Sivick] used the authority of his public office as a Supervisor by participating in the aforesaid discussions as well as later discussions with his fellow Supervisors regarding the changes to the [Handbook] to remove the Nepotism Policy. [Sivick]'s discussions/actions to effectuate the removal of the Nepotism Policy - a policy that [Sivick] had voted to approve only a few years earlier -

6

were undertaken with the specific intent, motivation, and purpose of enabling the hiring of [Sivick]'s [S]on . . . by the Township. Although [Sivick] abstained from the January 7, 2013[] vote of the Board that approved the revised [Handbook], he had already used the authority of his office to effectuate the removal of the Nepotism Policy from the [Handbook] prior to the vote.

. . . .

[Sivick] used the authority of his public office as a Supervisor when he discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of his [S]on as a Township employee. [Sivick] 'pled his case' to Vollmer about seeing his [S]on 'get a chance.' Fact Finding 35 d(2); *Stipulated Record*, at 75, lines 23-24. After the Nepotism Policy had been removed from the [Handbook], [Sivick] again asked Vollmer if it would be alright if he brought his [S]on in to be a Township employee. When Vollmer asked [Sivick] if [his Son] had qualifications for the Township position, [Sivick] responded affirmatively and informed Vollmer of his [S]on's qualifications.

Commission Adj. at 20-21. Finally, the Commission held:

[Sivick] used the authority of his public office when he used the actual power he had by being a Township Supervisor to access and influence his fellow Township Supervisors to effectuate both the elimination of the Township's Nepotism Policy and the hiring of [Sivick]'s [S]on. Given that the Nepotism Policy would have precluded the hiring of [Sivick]'s [S]on, and given that at least one of the Supervisors (Vollmer) raised concerns regarding hiring [Sivick]'s [S]on, it is clear that [Sivick's Son] would not have been hired as a Township employee but for [Sivick]'s use of the authority of his public office as a Supervisor to engage in discussions with and make recommendations to his fellow Supervisors and to lobby/influence or seek the support of those Supervisors with regard to eliminating the Nepotism Policy and hiring his [S]on. But for being a Supervisor, [Sivick] would not have been in a position to engage in such communications and to exert such influence to effectuate the hiring of his [S]on. [Sivick] was consciously aware of the private pecuniary benefit his [S]on

7

would receive if hired by the Township, and [Sivick]'s actions in getting the Nepotism Policy eliminated and his [S]on hired were steps to secure that private pecuniary benefit.

*Id*. at 21-22.

The Commission ordered Sivick to pay $30,000.00 in restitution to the Commonwealth of Pennsylvania and to file complete and accurate SFIs for 2011 and 2014. Sivick appealed to this Court.[13]

Initially,

[t]he Ethics Act is remedial legislation with the salutary purpose of assuring the integrity and honesty of the Commonwealth employees and, as such, must be 'liberally construed.' Section 1101.1(a) of the Ethics Act; *Maunus v. State Ethics Comm'n*, . . . 544 A.2d 1324, 1328 ([Pa.] 1988). Consequently, **the coverage of the Ethics Act must be construed broadly, and its exclusions must be construed narrowly.**

*Quaglia v. State Ethics Comm'n*, 986 A.2d 974, 979 (Pa. Cmwlth. 2010) (emphasis added).

The Commission bears the burden of proving a violation of the Ethics Act. In order to find a violation of the Ethics Act, at least four members of the Commission must find clear and convincing proof of a violation. Clear and

---

[13] "This Court's review is limited to determining whether the Commission's necessary factual findings are supported by substantial evidence or whether the Commission committed an error of law." *Quaglia v. State Ethics Comm'n*, 986 A.2d 974, 979 n.7 (Pa. Cmwlth. 2010). Further,

[s]tatutory interpretation is a question of law, for which our standard of review is *de novo*, and our scope is plenary. . . . ; *see Malt Beverages Distribs*[.] *Ass'n v. P*[*a.*] *Liquor Control B*[*d.*], . . . 974 A.2d 1144, 1154 ([Pa.] 2009) (citing *Seeton v. P*[*a.*] *Game Comm*[*'n*], . . . 937 A.2d 1028, 1037 ([Pa.] 2007) for the proposition that 'while courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court').

*Kistler v. State Ethics Comm'n*, 22 A.3d 223, 227 (Pa. 2011).

8

convincing proof is evidence that is so clear, direct, weighty, and convincing that it enables the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts at issue.

*G.L. v. State Ethics Comm'n*, 17 A.3d 445, 453 (Pa. Cmwlth. 2011) (citations omitted).

Sivick first argues that the Commission erred by concluding that Sivick violated the conflict of interest prohibition in Section 1103(a) of the Ethics Act due to his discussions with the Supervisors for the purpose of eliminating the Nepotism Policy so the Township could hire his Son, and his actions to effectuate his Son's hiring.

Section 1103(a) of the Ethics Act prohibits a "public official or public employee [from] engag[ing] in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). Section 1102 of the Ethics Act defines "[c]onflict" or "conflict of interest" as:

> **Use by a public official** or public employee **of the authority of his office or employment** or any confidential information received through his holding public office or employment **for the private pecuniary benefit of himself, a member of his immediate family**[14] or a business with which he or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102 (emphasis added). "Thus, in order to prove a violation, the Commission must establish by clear and convincing proof that: (1) a public official[15]

---

[14] The Ethics Act defines "[i]mmediate family" as "[a] parent, spouse, child, brother or sister." 65 Pa.C.S. § 1102.

[15] Section 1102 of the Ethics Act defines "[p]ublic official" as:

9

(2) used the authority of his office (3) for the private pecuniary gain of himself or a business with which he is associated." *G.L.*, 17 A.3d at 453.

Although Sivick acknowledges the record evidence demonstrating his "conscious awareness of private pecuniary gain[,]" he argues that there is "no evidence that [he] *used* the unique authority or powers of his office or employment to furnish that pecuniary gain." Sivick Br. at 19. In support, Sivick claims that he "took no action whatsoever to move, second or vote during the Board's public January 2013 decision to remove the [N]epotism [P]olicy from the [Handbook]." Sivick Br. at 14. He further asserts that with respect to his Son's hiring, he requested the Supervisors to vote on the hiring,[16] and he abstained from voting. In short, Sivick maintains that, rather than using the authority of his public office, he merely exercised his free speech rights under the First Amendment to the United States Constitution and *suggested* to his fellow Supervisors that the Township remove the Nepotism Policy and hire his Son.

With respect to the *use* of the authority of office necessary to violate Section 1103(a) of the Ethics Act, the Pennsylvania Supreme Court has explained:

> The word 'use' is not defined in the Ethics Act. The dictionary definition of the noun 'use' is '[t]he act of using or putting to a purpose[, *e.g.*,] the use of a car;' analogously,

---

> Any person elected by the public or elected or appointed by a governmental body or an appointed official . . . of this Commonwealth or any political subdivision thereof, provided that it shall not include members of advisory boards that have no authority to expend public funds other than reimbursement for personal expense or to otherwise exercise the power of the [s]tate or any political subdivision thereof.

65 Pa.C.S. § 1102. Sivick does not dispute that he was a public official during the relevant time periods.

[16] Sivick contends that he generally hired road crew without input from the other Supervisors. He asserts his request that the Supervisors' vote on his Son's hiring, and his abstention from voting, evidence his desire to avoid any conflict of interest.

10

the definition of the verb 'use' is '1. [t]o bring or put into service or action: employ[, *e.g.*,] use a pen [or] use your imagination[, or] 2. to put to some purpose: avail oneself of[, *e.g.*,] use the bus to get to work.' Webster's II New College Dictionary, Houghton Mifflin Co., 1995, at 1215. Thus, the common and approved usage of the word '**use**,' which must guide our inquiry, **indicates an action directed toward a purpose**. Accordingly, **to violate [Section] 1103(a) [of the Ethics Act], a public official must act in such a way as to put his office to the purpose of obtaining for himself a private pecuniary benefit.** Such directed action implies awareness on the part of the public official of the potential pecuniary benefit as well as the motivation to obtain that benefit for himself.

*Kistler v. State Ethics Comm'n*, 22 A.3d 223, 227 (Pa. 2011) (emphasis added). Further,

to violate the conflict of interest provision in subsection 1103(a) of the Ethics Act, <u>a public official must be consciously aware of a private pecuniary benefit for himself, his family, or his business, and then must take action in the form of one or more specific steps to attain that benefit.</u> . . . [T]his interpretation derives from the plain meaning of the statutory definition of conflict of interest, which requires that a public official **use** the authority of his office for private pecuniary benefit.

*Kistler*, 22 A.3d at 231 (underline emphasis added).

In *Kistler*, a member of an intermediate unit board of directors voted to authorize an architect to pursue construction of a school while simultaneously seeking a subcontract for his business from the same individual. The Court held that the Commission erred in holding that Kistler had violated the Ethics Act because there was "no evidence that [Kistler] had acted with awareness that his . . . vote . . . could or would result in his receipt of a subcontract . . . ." *Id.* In the instant matter, Sivick's actions evidence his clear intent to have the Township hire his Son. Further, Sivick acknowledges that record evidence demonstrates his conscious awareness of the private pecuniary gain therefrom.

11

In *Pulice v. State Ethics Commission*, 713 A.2d 161 (Pa. Cmwlth. 1998), Pulice, the president of a school district board of directors was charged with violating the Ethics Act's conflict of interest provision by participating in meetings from which a new assistant principal position was created, and by voting two months later to hire his son-in-law for the newly-created position. In concluding that no violation had been proven, this Court reasoned:

> [The] facts found by the Commission present strong, uncontradicted evidence that this newly[-]created position was not created specifically to promote or otherwise benefit [the] son-in-law, but was for the benefit of the [d]istrict. There is no evidence at all from which it can be inferred, rather than speculated, that [Pulice] 'used his authority' for the private pecuniary benefit of [his] son-in-law by voting for the creation of the new position. At the time that [Pulice] voted on the creation of the new position there were no applicants. Consequently, there is not even substantial evidence, let alone clear and convincing evidence that supports the Commission adjudication that [Pulice] violated [S]ection 3(a) of the [Ethics Law.[17]]

*Pulice,* 713 A.2d at 164.

Unlike in *Pulice*, the evidence in this case reveals Sivick's clear intent to have the Township remove the Nepotism Policy from the Handbook and hire his Son. Because Sivick acknowledges evidence of his conscious awareness of a private pecuniary gain, this Court must consider whether Sivick "[took] action in the form of one or more specific steps to attain that benefit." *Kistler,* 22 A.3d at 231.

---

[17] The original State Ethics Law, Act of October 4, 1978, P.L. 883, was reenacted and amended by the Act of June 26, 1989, P.L. 26, *formerly* 65 P.S. § 403(a). The original State Ethics Law was repealed in 1998 and replaced by the Ethics Act.

The *Pulice* Court also concluded that the Ethics Act's conflict of interest provision did not apply to in-laws.

Section 1102 of the Ethics Act requires that the steps taken must have involved "[u]se . . . of the authority of his office or employment[.]" 65 Pa.C.S. § 1102. The Commission contends that Sivick used the authority of his public office

> when he told a fellow [S]upervisor they (the [S]upervisors) were going to have to remove the [N]epotism [P]olicy to hire his [S]on; when Sivick spoke to the other [S]upervisors in order to gain support for the removal of the [N]epotism [P]olicy in order to hire his [S]on; when Sivick told a fellow [S]upervisor not to note the changes to the [N]epotism [P]olicy in the [H]andbook; when Sivick failed to state why he abstained on the vote to remove the [N]epotism [P]olicy; when Sivick lobbied other [S]upervisors to hire his [S]on because his [S]on was having a rough time; when Sivick included his [S]on in [T]ownship roadworker training before his [S]on had even submitted an application; and when Sivick's [S]on was hired without any formal notation in the Township's meeting minutes.

Commission Br. at 24-25. It is clear based on this Court's record review that substantial record evidence supports the Commission's findings that Sivick engaged in such conduct. Thus, this Court must determine whether these actions involved "the authority of [Sivick's] office or employment[.]" 65 Pa.C.S. § 1102.

The Commission has repeatedly and consistently held that "[u]se of authority of office is more than the mere mechanics of voting and encompasses all of the tasks needed to perform the functions of a given position. Use of authority includes . . . discussing, conferring with others, and lobbying for a particular result." *In re Gallen*, Commission Order No. 1198 at 37 (2001) (citation omitted);[18] *see also*

---

[18] The Commission cites to its *Gallen* decision in its brief to this Court which, in a citation, reflects that the decision was "[a]ffirmed by *Gallen v. State Ethics Commission*[ (Pa. Cmwlth.] No. 1497 C.D. 2001[, filed August 9, 2002)] (unreported panel decision)." Commission Br. at 21 n.3. Sivick contends in his Reply Brief to this Court:

> [T]he [Commission's Investigative] Division [(Division)] argues that deference should be given to its **solitary decision** in *In re Gallen*, Order 1198 (2001) which was **ostensibly** affirmed by the Commonwealth Court in an unreported decision at 1497 C[.]D[.]

13

*Bloom*, Commission Order No. 1722 (2017); *Yusko*, Commission Order No. 1705 (2016); *Esposito*, Commission Order No. 1333 (2004); *Yurek*, Commission Order No. 1286 (2003); *Zwick*, Commission Order No. 1062 (1997); *Juliante*, Commission Order No. 809 (1991).[19]

The Ethics Act defines "[a]uthority of office or employment[]" as "[t]he actual power **provided by law**, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public employment." 65 Pa.C.S. § 1102 (emphasis added). Section 607 of The Second Class Township Code (Code), 53 P.S. § 65607,[20] describes the Supervisors' duties to include general Township governance and employing persons necessary for the

> 2001. A search of this Commonwealth Court case number yields no opinions or docket sheets. While [a Commission] enforcement action was filed against a certain 'Michael Gallen' at 820 M[.]D[.] 2002, this case was discontinued for want of service of process. The Division's reliance on *Gallen*, therefore, should be rejected out of hand. Indeed, even if this 2001 appeal resulted in an unpublished decision in 2002 or 2003, the [Commonwealth Court's] Internal Operating [Procedures (IOP)] do not permit this case to [be] cited for persuasive value. *See* Commonwealth Ct[.] IOP, § 414 ('. . . Parties may also cite an unreported panel decision of this court issued after January 15, 2008 for its persuasive value'). Inaccessible caselaw should have no value.

Sivick Reply Br. at 15-16 (citation omitted; emphasis added). Contrary to Sivick's representation, the Commission did **not** cite to this Court's *Gallen* decision for its persuasive value, but rather as the Commission's precedent. The reference to this Court's affirmance was a proper inclusion of the subsequent procedural history in the Commission's citation to its own decision. By way of further explanation, this Court indeed issued an unreported decision in *Gallen* on August 9, 2002 under docket number 1497 C.D. 2001. However, the matter was sealed and the docket and case material is not publicly accessible. Finally, it is clear that the rule for which the Commission cited *Gallen* is not contained exclusively in that "solitary decision." Sivick Reply Br. at 15. There are numerous, consistent Commission decisions spanning more than twenty-five years evidencing the Commission's interpretation.

[19] Although the issue before this Court is a question of law, the Court may consider the interpretation of the agency charged with administrating the statute at issue. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a), provides that the object of statutory interpretation is to ascertain and effectuate the General Assembly's intent.

[20] Section 607 of the Code was added by Section 1 of the Act of November 9, 1995, P.L. 350, *as amended*.

14

conduct of Township business. Section 603 of the Code, 53 P.S. § 65603, requires the Board to meet at least once per month to transact business. An affirmative majority vote at a public meeting is required for the transaction of any business. *Id.* Section 2302 of the Code mandates that, as Roadmaster, Sivick shall:

> (1) Report to the [Board] any information that may be required by the [Board] and by the Department of Transportation.
>
> (2) Inspect all roads and bridges as directed by the [Board].
>
> (3) Do or direct to be done all work necessary to carry out the responsibilities imposed by the [Board] with respect to the maintenance, repair and construction of [T]ownship roads.

53 P.S. § 67302.[21]

The Code governs and authorizes the Supervisors' authority to engage in meetings for the purpose of conducting Township business.[22] The record evidence reflects that **Board Chairman** and Roadmaster Sivick met with Supervisors Vollmer and Menditto to initiate and promote official Board action to eliminate the Township's Nepotism Policy and to discuss and encourage his Son's hiring. Thus, Sivick's access to and influence over the other Supervisors was rooted in his official authority, as "actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to" his position as Supervisor and Board Chairman. 65 Pa.C.S. § 1102.

Regardless of whether Sivick's interaction with the other Supervisors about repealing the Nepotism Policy and hiring his Son were considered requests, recommendations or veiled heavy-handed mandates, they were nevertheless made in his capacity as Board Chairman and Roadmaster. His use of his authority to promote

---

[21] Section 2302 of the Code was added by the Act of November 9, 1995, P.L. 350.

[22] Such discussions are deemed "deliberation" under Section 703 of the Sunshine Act. 65 Pa.C.S. § 703 ("The discussion of agency business held for the purpose of making a decision.").

15

his Son's hiring was the exercise of "actual power provided by law[.]" 65 Pa.C.S. § 1102. Thus, this Court agrees with the Commission that "[u]se of authority of office is more than the mere mechanics of voting and encompasses all of the tasks needed to perform the functions of a given position. Use of authority includes . . . discussing, conferring with others, and lobbying for a particular result." *Gallen*, Commission Order No. 1198 at 37 (citation omitted).

The fact that Sivick abstained from voting to remove the Nepotism Policy from the Handbook is not dispositive when he initiated and encouraged the other Supervisors to eliminate the Nepotism Policy so the Board could vote on his Son's hiring, and then lobbied the Township to hire his Son. Instead, the totality of the circumstances make clear that Sivick violated Section 1103(a) of the Ethics Act when he took those actions.[23] Accordingly, the Commission properly determined that Sivick violated Section 1103(a) of the Ethics Act's conflict of interest prohibition.

Sivick next contends that the Commission erred when it concluded that he committed a conflict of interest violation by verifying Township payroll records for Sivick's Son because there is no evidence that Sivick's Son acquired a pecuniary benefit to which he was not entitled and because Sivick's Son was a member of a class/subclass of employees subject to Sivick's supervision. Sivick argues that this Court has interpreted the Ethics Act to require pecuniary gain to be something to

---

[23] Sivick also argues that his First Amendment free speech rights would be infringed if this Court finds merely "inquiring whether the other [Supervisors] might hire the public official's [S]on[,]" violates the Ethics Act's conflict of interest provision. Sivick Br. at 21. In support, Sivick cites to federal case law, a Superior Court decision, and several Pennsylvania Supreme Court decisions.

However, the Commission, as trier of fact, found Sivick's conduct far more intrusive than merely "inquiring." Sivick Br. at 21. Further, the cited decisions do not involve conduct of the type at issue here. In fact, in *Commonwealth v. Orie*, 88 A.3d 983 (Pa. Super. 2014), the Superior Court rejected a claim that the Ethics Act impermissibly intruded on First Amendment rights, stating: "[T]he [Ethics Act] places no restrictions on a public official's federal or state protected rights of expression and association, but only prohibits officials from using state-funded resources for non-*de minimis* private pecuniary gain." *Id.* at 1026.

16

which the individual is not entitled, and the record is devoid of any such gain since there is no evidence that Sivick's Son failed to perform his employment duties.

In support, Sivick first cites to *Kraines v. Pennsylvania State Ethics Commission*, 805 A.2d 677 (Pa. Cmwlth. 2002). In *Kraines*, this Court reversed the Commission's adjudication declaring that a county controller violated the Ethics Act's conflict of interest provisions when she signed payroll checks to her husband, a forensic pathologist who provided services to her county. This Court found that Kraines did not improperly use her office to gain pecuniary benefits to which her husband was not entitled because he had been performing autopsies for the county years before Kraines was county controller. In addition, Kraines had no role in the county coroner's decision to use her husband's services and had no involvement in the amount her husband and other pathologists were paid. This Court further explained: "While Kraines approved payments via her stamped signature on [c]ounty checks to her husband for pathologist fees, such action in and of itself does not constitute an ethics violation as [Kraines' husband] was **entitled** to these fees." *Id*. at 681 (emphasis added).

Unlike in *Kraines*, where Kraines' husband had been performing county autopsies before Kraines was hired, Sivick initiated the improper scheme to have the Township's Nepotism Policy repealed and his Son hired, which directly resulted in the Township employing his Son and Sivick approving his Son's payroll records. Thus, *Kraines* is inapposite.

Sivick also contends that, because his Son's pecuniary gain was the salary his Son earned for performing Township work, *i.e.*, "compensation provided by law[,]" no conflict exists. Sivick relies on the language in Section 3(a) of the former Ethics Law, that: "No public official or public employee shall use his public office . . . to obtain financial gain **other than compensation provided by law** for himself, a member of his immediate family, or a business with which he is

associated." *Formerly* 65 P.S. § 403(a), Act of October 4, 1978, P.L. 883 (emphasis added).

In contrast, the current Ethics Act prohibits a public official from engaging in conduct constituting a conflict of interest, 65 Pa.C.S. § 1103(a), which is defined in part as using the authority of office "for the **private pecuniary benefit** of himself, [or] a member of his immediate family . . . ." 65 Pa.C.S. § 1102 (emphasis added). Therefore, the current Ethics Act's conflict of interest provision applicable here no longer uses the "other than compensation provided by law" language. Section 3(a) of the Ethics Law, *formerly* 65 P.S. § 403(a).

Based on this distinction, the Commission contends that the use of official authority for any "private pecuniary benefit," 65 Pa.C.S. § 1102, is a prohibited conflict of interest, even if the benefit is "compensation provided by law[.]" *Formerly* 65 P.S. § 403.

In response, Sivick argues that the "other compensation provided by law" language remains in Section 1101.1(a) of the Ethics Act, wherein the General Assembly declared "that public office is a public trust and that any effort to realize personal financial gain through public office **other than compensation provided by law** is a violation of that trust." 65 Pa.C.S. § 1101.1(a) (emphasis added). Sivick urges that that language should be incorporated into the "pecuniary benefit" language in Section 1102 of the Ethics Act.[24]

---

[24] Sivick relies on *Kraines* and *McGuire v. State Ethics Commission*, 657 A.2d 1346 (Pa. Cmwlth. 1995), to support his proposition that in order to violate Section 1103 of the Ethics Act, a public official must *use* his public office in a way that "facilitates his receipt of compensation **to which he is not entitled**." *Kraines*, 805 A.2d at 681 (emphasis added). As discussed *supra*, *Kraines* is distinguishable.

*McGuire* is similarly distinguishable. Therein, the Commission found that a township sewer authority's board members improperly received monthly meeting pay in excess of what was authorized. In reversing the Commission, this Court concluded:

> [T]here was no action taken by either [board member] regarding the
> monthly meeting pay they received. The [Commission] determined

18

Sivick's argument is not convincing. In *Snyder v. State Ethics Commission*, 686 A.2d 843, 853 n.16 (Pa. Cmwlth. 1996), this Court clearly stated that, given the Ethics Act's amendments, "the current conflict of interest standard . . . makes **any private pecuniary gain to a public official a violation,** *whether or not such compensation is otherwise provided for by law***.**" (Emphasis added).

Sivick's Son was hired as a direct result of Sivick using his official authority to change the Handbook to achieve that specific goal. Because the Township hired Sivick's Son as a direct consequence of Sivick's conduct, Sivick's participation in approving his Son's payroll time sheets so as to obtain pecuniary benefit violated the Ethics Act's conflict of interest provision. Accordingly, Sivick's argument fails.

Sivick also asserts that reviewing his Son's time sheets and forwarding them for payment did not violate the Ethics Act because

> [t]he definition of 'conflict of interest' does not include an action '*which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.'* Section 1102 of the Ethics Act (emphasis added).

*Kraines*, 805 A.2d at 682. The Commission rejected this argument, explaining:

---

> that all of the compensation they received, including compensation for attending the [township sewer authority] board meetings, was based on amounts that were determined [10 years] prior to the time they were members of the [b]oard. As such, they merely accepted what was given to them and did not use their office for personal financial gain.

*McGuire*, 657 A.2d at 1352.

Although [Sivick] contends that the class/subclass exclusion to the definition of 'conflict' or 'conflict of interest' would be applicable to the aforesaid actions, that argument fails. The review of each individual employee's time[ ]sheets and the subsequent approval of that individual's payroll as part of the total payroll for Township employees would not fall under the class/subclass exclusion because the review and approval as to each employee would be separate and specific to that individual based upon his/her time[ ]sheet.

[Sivick's] use of the authority of his public positions to have the Nepotism Policy eliminated, to have his [S]on hired, and to sign time[ ]sheets and effectuate payments to his [S]on for hours of work claimed resulted in a private pecuniary benefit consisting of the compensation [his Son] received from the Township for a job he would not otherwise have held.

Commission Adj. at 22. Sivick's actions were not broad conduct generally affecting a class - his employees. Instead, he reviewed each employee's individual time sheet presumably to consider whether it accurately reflected that employee's working hours. Thereafter, he issued approvals based on each such individual's time sheet. We discern no error in the Commission's analysis. Thus, Sivick's argument is unfounded.

Sivick next argues that he did not violate Section 1105(a) and 1105(b)(5) of the Ethics Act when he omitted certain information from his 2011 and 2014 SFIs. The Commission explained:

[Sivick] timely filed SFIs for calendar years 2011 through 2015 with the Township. On [Sivick]'s SFI for calendar year 2011, Block 5, requiring disclosure of the governmental entity served, was not completed. Additionally, Block 10, requiring disclosure of any direct/indirect source of income totaling in the aggregate $1,300 or more, did not identify the Township as a source of income. On [Sivick]'s SFI dated March 30, 2015 -- ostensibly for calendar year 2014 -- Block 7, requiring disclosure of the calendar year for which the form was being filed, was not completed.

20

[Sivick] acknowledges the aforesaid deficiencies on his forms but essentially argues that someone reviewing the forms could infer or discover through other means the information he failed to plainly disclose on his SFI forms. *See*[ *Sivick's*] *Initial Brief*, at 35-38.

For the calendar year 2011 form, [Sivick] notes that via Blocks 4 and 6 of the form, [Sivick] disclosed his positions as Township Supervisor, Roadmaster, and Public Works Director, and he argues that his filing of the form with [the] Township for these local government positions would have signaled that [the] Township was where he was serving. (*See*[ *Sivick*]*'s Initial Brief*, at 37). Additionally, [Sivick] asserts that the fact that he was entitled to compensation from the Township was a matter of general public knowledge, and the amounts are accessible from other sources and by other means, such as a review of the minutes of the Township Board of Auditors or through Right-to-Know Law[25] requests. *Id.*

For [Sivick]'s SFI dated March 30, 2015 -- ostensibly for calendar year 2014 -- [Sivick] contends that the date on the form signaled that it was for calendar year 2014 as no one could reasonably infer that the form filed in March of 2015 would reliably disclose information for the next nine months. (*See*[ *Sivick*]*'s Initial Brief*, at 37). [Sivick] further argues that because [Sivick] filed other SFIs for calendar years 2010, 2011, 2012, and 2013, there was no other possible year the form dated March 30, 2015, could have covered. (*See*[ *Sivick*]*'s Initial Brief*, at 38).

It is the filer's duty to properly complete the SFI form. [Sivick]'s deficiencies may not be dismissed merely because a savvy reviewer of his SFI forms might have been able to infer or discover through other means what [Sivick] failed to disclose.

Accordingly, we hold that [Sivick] violated Section[] 1105(a) and 1105(b)(5) of the Ethics Act, 65 Pa.C.S. §[] 1105(a), (b)(5), but did not violate Section 1104(a) of the Ethics Act, 65 Pa.C.S. § 1104(a), when he filed timely but deficient SFIs for calendar years 2011 and 2014.

Commission Adj. at 23.

---

[25] Right-to-Know Law, Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

Sivick cites to the Pennsylvania Supreme Court decision in *In re Benninghoff*, 852 A.2d 1182 (Pa. 2004) and claims that his filings did not violate the Ethics Act. *Benninghoff* involved a petition to set aside Benninghoff's nomination petition for the office of Representative in the General Assembly from the 171st Legislative District. Benninghoff, the incumbent, attached his SFI to his nomination petition. However, the SFI did not list the Commonwealth as a direct source of income from his role as state representative. An elector filed a petition to set aside Benninghoff's nomination petition. On appeal, the Supreme Court concluded that although Benninghoff's receipt of a Commonwealth salary was not included, he substantially complied with the requirements of the Ethics Act. As such, the Court held that "where . . . a candidate has substantially complied with the requirements of the Ethics Act and there is a technical defect appearing on the face of a candidate's [SFI], such a defect is subject to the candidate's amendment." *Benninghoff*, 852 A.2d at 1189.

However, *Benninghoff* does not stand for the proposition that failure to disclose government compensation in an SFI is not an Ethics Act violation. Instead, it holds that a candidate may amend a technical defect appearing on the face of the SFI to avoid removal from the ballot. Accordingly, *Benninghoff* does not direct this Court's review.

Sivick concedes that he did not complete the required information, but argues that his omission is immaterial because the SFI is filed with the Township, and the Township was aware of his Supervisor and Roadmaster positions. Notwithstanding, Section 1105(a) of the Ethics Act states:

> The [SFI]s filed pursuant to this chapter shall be on a form prescribed by the [C]ommission. **All information requested on the statement shall be provided to the best of the knowledge, information and belief** of the person

22

required to file and shall be signed under oath or equivalent affirmation.

65 Pa.C.S. § 1105(a) (emphasis added). The Ethics Act clearly states what must be included in an SFI filing.[26] Because Sivick did not provide all of the required

---

[26] Section 1105(b) of the Ethics Act provides:

> The [SFI] shall include the following information for the prior calendar year with regard to the person required to file the statement:
>
> (1) Name, address and public position.
>
> (2) Occupation or profession.
>
> (3) Any direct or indirect interest in any real estate which was sold or leased to the Commonwealth, any of its agencies or political subdivisions, or purchased or leased from the Commonwealth, any of its agencies or political subdivisions, or which was the subject of any condemnation proceedings by the Commonwealth, any of its agencies or political subdivisions.
>
> (4) The name and address of each creditor to whom is owed in excess of $6,500 and the interest rate thereon. . . .
>
> (5) The name and address of any direct or indirect source of income totaling in the aggregate $1,300 or more. . . .
>
> (6) The name and address of the source and the amount of any gift or gifts valued in the aggregate at $250 or more and the circumstances of each gift. . . .
>
> (7) The name and address of the source and the amount of any payment for or reimbursement of actual expenses for transportation and lodging or hospitality received in connection with public office or employment where such actual expenses for transportation and lodging or hospitality exceed $650 in an aggregate amount per year. . . .
>
> (8) Any office, directorship or employment of any nature whatsoever in any business entity.
>
> (9) Any financial interest in any legal entity engaged in business for profit.
>
> (10) The identity of any financial interest in a business with which the reporting person is or has been associated in the preceding calendar year which has been transferred to a member of the reporting person's immediate family.

65 Pa.C.S. § 1105(b).

23

information, his filings were deficient. Accordingly, the Commission did not err by concluding that Sivick violated Section 1105(a) and 1105(b)(5) of the Ethics Act and ordering him to amend his 2011 and 2014 SFIs.[27]

Finally, Sivick asserts that the Commission erred and abused its discretion by ordering him to make a $30,000.00 restitution payment to the Commonwealth.[28] Sivick raises several arguments in support of his position. First, Sivick contends that no restitution is warranted because he did not violate the Ethics Act. However, having already ruled that Sivick violated the Ethics Act, this argument fails.

Sivick also claims that restitution may only be granted under the Ethics Act where a ***public official or public employee* has obtained a financial gain** in violation of the Ethics Act. *See* 65 Pa.C.S. § 1107(13). According to Sivick, since Sivick's Son - the only individual who obtained a financial gain - is not a public official or public employee,[29] the Commission was not authorized to order restitution.

---

[27] The Commission did **not** require disgorgement of Sivick's 2011 and 2014 compensation as a result of his deficient SFIs, but merely required that he amend them.

[28] The Commission did not explain in its opinion why it chose restitution in the amount of $30,000.00.

[29] Section 1102 of the Ethics Act defines "public employee[,]" in relevant part, as:

Any individual employed by the Commonwealth or a political subdivision who is responsible for taking or recommending official action of a nonministerial nature with regard to:

(1) contracting or procurement;

(2) administering or monitoring grants or subsidies;

(3) planning or zoning;

(4) inspecting, licensing, regulating or auditing any person; or

(5) any other activity where the official action has an economic impact of greater than a de minimis nature on the interests of any person.

65 Pa.C.S. § 1102.

This Court cannot agree with Sivick's interpretation. Section 1107(13) of the Ethics Act states, in pertinent part, that "[a]ny order resulting from a finding that a public official or public employee has obtained a financial gain in violation of this chapter may require the restitution plus interest of that gain to the appropriate governmental body." *Id.* This Court interprets Section 1107(13) of the Ethics Act consistent with Section 1102 of the Ethics Act, which defines "conflict of interest," in relevant part, as "[u]se by a public official or public employee of the authority of his office or employment . . . for the private pecuniary benefit of himself, [or] a member of his immediate family . . . ." 65 Pa.C.S. § 1102. Thus, the reference to "a finding that a public official or public employee **has obtained a financial gain in violation of this chapter**" in Section 1107(13) of the Ethics Act, 65 Pa.C.S. § 1107(13) (emphasis added), refers to a financial gain "benefit[ting the public official or public employee], [or] a member of his immediate family[.]" 65 Pa.C.S. § 1102. Any other interpretation would be illogical and result in an inconsistent application of the Ethics Act based solely upon who happened to benefit from the prohibited conduct. More importantly, this Court has already concluded that Sivick violated the Ethics Act by using the authority of his office for his Son's private pecuniary benefit. Had Sivick not engaged in the improper conduct, the Board would not have rescinded the Nepotism Policy or hired his Son. Because Sivick's Son's salary was a direct consequence of Sivick's use of his authority of office, it was "financial gain in violation of [the Ethics Act]" for which the Commission could order restitution. 65 Pa.C.S. § 1107(13). Accordingly, this Court rejects Sivick's argument.

Next, Sivick claims that the Commission improperly ordered restitution be paid to the Commonwealth rather than to the Township. He argues "the appropriate governmental body" described in Section 1107(13) of the Ethics Act refers to the Township since the Township hired and paid Sivick's Son. Sivick further asserts that there is no evidence of any articulated loss to the Commonwealth.

25

The Commission responds that this Court has consistently sanctioned the Commission's authority to order restitution and that restitution to the **Commonwealth** is appropriate because permitting such promotes "confidence in government." Commission Br. at 38.

The Pennsylvania Superior Court has explained that, in criminal matters, an offender "has no standing to question contractual or subrogation rights which govern disposition of moneys paid via restitution to the victim." *Commonwealth v. Kerr*, 444 A.2d 758, 761 (Pa. Super. 1982). In *Kerr*, the Superior Court rejected the offender's argument that a "right of subrogation transforms the sentence [ordering restitution] into an order directing payment to one who was not the victim of the crime." *Id*. at 760-61. This Court finds *Kerr* instructive. In the instant matter, there is no question that Sivick's improper conduct resulted in Sivick's Son's receipt of significant pecuniary benefit. Thus, restitution is appropriate and, for reasons similar to those in *Kerr*, this Court concludes that Sivick may not seek to invalidate the Commission's order by challenging that restitution has been ordered to the wrong party.[30]

For all of the above reasons, the Commission's final adjudication and order is affirmed.

_____
ANNE E. COVEY, Judge

---

[30] This Court observes that the Township has not intervened to challenge the Commission's restitution order.

<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

John P. Sivick,                        :
               Petitioner      :
                           :
             v.                    :
                           :
State Ethics Commission,               :   No. 252 C.D. 2018
               Respondent      :

# O R D E R

AND NOW, this 3rd day of January, 2019, the State Ethics Commission's February 1, 2018 final adjudication and order is affirmed.

_____
ANNE E. COVEY, Judge