**[J-47-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| JOHN P. SIVICK, | : | No. 62 MAP 2019 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 252 CD |
| | : | 2018 dated January 3, 2019, |
| v. | : | Reconsideration denied on |
| | : | February 1, 2019, Affirming the |
| | : | Order by the Ethics Commission at |
| STATE ETHICS COMMISSION, | : | No. 16-001, Order No. 1731 dated |
| | : | February 1, 2018, exited February 8, |
| Appellee | : | 2018. |
| | : | |
| | | ARGUED: May 21, 2020 |

**OPINION**

**JUSTICE WECHT**                                        **DECIDED: October 1, 2020**

John Sivick's son wanted a job—or at least Sivick wanted his son to have one. An old story, but notable in this case because Sivick père was a Lehman Township Supervisor, and he hoped to arrange a position for his son in the Township's employ. After leaning on his fellow Supervisors,[1] Sivick successfully emplaced his son on a Township road crew. Following an ethics complaint and an investigation, the State Ethics Commission ("Commission") rewarded Sivick for his paternal determination by finding that

---

[1]    The Township Supervisors at the receiving end of Sivick's efforts dispute the balance of honey and vinegar in his approach.

Sivick violated the Public Official and Employee Ethics Act ("the Act")[2] in several respects. As the lone sanction relative to this aspect of the ethics complaint, the Commission imposed $30,000 in restitution. Sivick filed a petition for review of the Commission's adjudication and restitution order in the Commonwealth Court, challenging, *inter alia*, the Commission's adjudication of a conflict of interest[3] violation as well as the legal authority to impose restitution. The Commonwealth Court affirmed the Commission's decision,[4] and Sivick filed a petition for allowance of appeal in this Court. We granted review, and we reverse on both points.

Lehman Township is a second-class township in Pike County with a three-member Board of Supervisors. Sivick served as a Supervisor from 1994 to 2017, and as Chairman of the Board from 2004 to 2017.[5] During his tenure as Supervisor, Sivick also served as the Roadmaster and Public Works Director, and was responsible for hiring all Township employees. In 2009, Paul Menditto, a fellow Supervisor, updated the Township's employee handbook to include, among other provisions, a nepotism policy. The policy

---

[2] Act of Oct. 15, 1998, P.L. 729, No. 93, *codified as amended at* 65 Pa.C.S. §§ 1101, *et seq.*

[3] *See* 65 Pa.C.S. §§ 1102, 1103(a).

[4] *See Sivick v. State Ethics Comm'n,* 202 A.3d 814 (Pa. Cmwlth. 2019).

[5] This factual summary is based upon the Commission's account, much of which relies upon stipulations of fact and the parties' stipulations regarding what testimony certain witnesses would offer if called to testify. *See In re John P. Sivick*, No. 16-001, Final Adjudication of the State Ethics Commission, Order No. 1731, at 1-13 (mailed 2/8/2018) ("Commission Adjudication" or "Adjudication"). The Commission made additional and presently uncontested findings of fact that we accept as true. *See id.* at 13-16; *cf. Dodaro v. Pennsylvania State Ethics Comm'n*, 594 A.2d 652, 653 (Pa. 1991) ("The scope of appellate review of the [Ethics] Commission's order is limited to determining whether constitutional rights have been violated, an error of law has been committed, or whether necessary factual findings are not supported by substantial evidence.").

prohibited the hiring of an individual to a position in which they would supervise or be supervised by an immediate family member.[6] The Board, including Sivick, voted to approve the revised handbook.

In 2012, Sivick told fellow Supervisors Menditto and Richard Vollmer, in one-on-one conversations, that he wanted the Township to hire his son ("Son"). Both Supervisors indicated that, for the Township to employ Son, the nepotism policy would have to be removed from the employee handbook. Menditto prepared a revision to the handbook to eliminate the policy, and, at a January 7, 2013 Board meeting, Menditto moved to approve the amended handbook and Vollmer seconded the motion. Despite the Board's general practice of preparing an errata sheet reflecting handbook changes, Menditto did not prepare such a sheet to reflect the removal of the policy. Sivick was present, but abstained. With Menditto's and Vollmer's support, the motion carried.[7]

---

[6]     The policy provided, in relevant part:

> No person shall be hired by Lehman Township in a full-time, permanent position where the person shall supervise or be supervised by a member of the person's immediate family. This prohibition applies to supervision at any level, whether immediate or through subordinate supervisors, and applies to any situation where control or direction of the relative's work covered cause [*sic*] a conflict of interest. Immediate family is defined as one's spouse, parent, son or daughter, sister or brother, grandparent or grandchild.

Stipulated Record at 6-7 ¶19.a.

[7]     The meeting minutes do not indicate that the handbook was amended to remove the nepotism policy. Instead, under the header "Approve Employee Benefits and Information," the minutes provide: "Motion made by Mr. Menditto and second of Mr. Vollmer to approve the employee benefits and information. Mr. Sivick abstained." *Id.* at 14, ¶42.c. Sivick later voted to approve these minutes.

As Roadmaster, Sivick coordinated and scheduled training classes for Township road crew employees. On March 20, 2013, Son was listed on a registration form submitted on behalf of the Township enrolling six individuals in a traffic control flagger training course mandated by the Pennsylvania Department of Transportation. Sivick approved the list of registrants. Son attended the training, but he had yet to apply for a position. On June 3, 2013, Son applied for Township employment in the position of "Public Works Maintenance."

Five official Board meetings were held in June, with two in the period between the date of Son's application and the beginning of his Township employment on June 10, 2013, but the minutes from these meetings do not reflect any discussion or vote with regard to Son's employment.[8] As Public Works Director, Sivick was responsible for reviewing, verifying, and signing timesheets for all Township employees, including Son. Over eighty-one pay periods between 2013 and 2016, the Township paid Son gross earnings totaling $126,552. Son's Township employment ended on June 30, 2016.

On November 15, 2015, the Commission received a signed, sworn complaint alleging that Sivick violated the Ethics Act. In January 2016, the Commission began a preliminary inquiry, which led to a full investigation. During its investigation, the Commission interviewed Township Supervisors and other public employees. Vollmer told

---

[8] This is discrepant with the parties' stipulation that, if called to testify, Menditto would attest that "there was no formal hiring process at the Township during the entire time he served as a Township Supervisor [2004-2014], but rather, [Sivick] did all of the hiring." *Id.* at 10 ¶34.d. Menditto also would testify that the lone exception during his tenure was in Son's case, which, he contended, *was* subject to a Board vote, Sivick abstaining, approved by Menditto and Vollmer. Vollmer corroborated this account. *Id.* at 10-11 ¶34.f, 12 ¶35.j.

the Commission that he raised "various concerns about hiring [Sivick]'s son," but relented after Sivick "pled his case . . . about seeing his son get a chance."[9] When Vollmer mentioned that the nepotism policy stood in the way, Sivick said "we're going to have to change the book then."[10] In stipulated testimony, Township Treasurer Robert Rohner asserted that Sivick told him, "I want to hire my son[, so] we need to change the [handbook],"[11] and that Sivick "did not present the handbook change and hiring Sivick's [s]on as a suggestion, but rather as a directive."[12] Rohner also told the Commission investigator that Sivick created the road crew position specifically for Son.[13]

On February 1, 2018, the Commission issued its final adjudication, determining that Sivick violated, *inter alia*, Subsection 1103(a), the conflict of interest provision of the Act.[14] Subsection 1103(a) provides: "No public official or public employee shall engage in conduct that constitutes a conflict of interest."[15] "Conflict of interest" is defined, in relevant part, as "[u]se by a public official or public employee of the authority of his office

---

[9] Comm. Adj. at 11-12 ¶35.d (quoting Stipulated Record at 75).

[10] *Id.* at 12 ¶35.d.4 (quoting Stipulated Record at 69).

[11] *Sivick*, 202 A.3d at 817 n.8 (quoting Stipulated Record at 39).

[12] *Id.* (citing Stipulated Record at 39-40).

[13] *Id.* at 818 n.12 (citing Stipulated Record at 24).

[14] The Commission also ruled that Sivick violated Subsections 1104(d) and 1105(a) of the Act for filing deficient statements of financial interest ("SOFI") and Subsection 1105(b)(5) because he received compensation from the Township when he did not have accurate and complete SOFIs on file. These violations are not at issue in this case.

[15] 65 Pa.C.S. § 1103(a).

or employment . . . for the private pecuniary benefit of himself [or] a member of his immediate family."[16]

Specifically, the Commission found:

Sivick used the authority of his public positions for the private pecuniary benefit of Son . . . [1] when he participated in discussions and actions of the Board to eliminate the Township's Nepotism Policy with the intent and for the purpose of having Son hired as a Township road crew employee; [2] when he discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of Son as a Township employee; and [3] when he verified Township records enabling and/or otherwise directing the payment of salary/wage to Son from public monies.

* * * *

Sivick's discussions/actions to effectuate the removal of the Nepotism Policy—a policy that Sivick had voted to approve only a few years earlier— were undertaken with the specific intent, motivation, and purpose of enabling the hiring of Son . . . by the Township.

* * * *

But for being a Supervisor, Sivick would not have been in a position to engage in such communications and to exert such influence to effectuate the hiring of Son. Sivick was consciously aware of the private pecuniary benefit Son would receive if hired by the Township, and Sivick's actions in

---

[16] In full, the Act defines conflict of interest and delineates a broad exception to the rule that is central to the discussion that follows:

Use by a public official or public employee of the authority of his office or employment . . . for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a *de minimis* economic impact or which affects to the same degree or class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102. Conflict of interest is a felony subject to a fine of up to $10,000 and/or imprisonment for up to five years. *Id.* § 1109(a).

getting the Nepotism Policy eliminated and Son hired were steps to secure that private pecuniary benefit.[17]

The Commission ordered Sivick to pay $30,000 in restitution pursuant to 65 Pa.C.S. § 1107(13), which provides that "[a]ny order resulting from a finding that a public official or public employee has obtained a financial gain in violation of this chapter may require the restitution plus interest of that gain to the appropriate governmental body."[18]

Sivick filed a timely petition for review in the Commonwealth Court, raising five issues, only two of which are relevant here. First, Sivick maintained that the Commission erred in concluding that he committed a conflict of interest violation by verifying and approving Son's payroll records—item [3] in the above excerpt—because Son was a member of a subclass subject to Sivick's supervision, and thus fell within the subclass exception codified in the definition of conflict of interest.[19] Second, Sivick argued that the Commission abused its discretion by ordering him to pay restitution under Subsection 1107(13) of the Act, when any financial benefit redounded solely to Son, who was compensated on par with his cohort for the work he performed, and who was neither a public official nor a public employee subject to restitution.

The Commonwealth Court affirmed the Commission's adjudication. To prove a violation of Subsection 1103(a) of the Act, the court explained, the Commission must

---

[17]    Comm. Adj. at 20-22 (names changed for consistency of reference).

[18]    The Commission also directed Sivick to file complete and accurate SOFIs for 2011 and 2014.

[19]    *See* 65 Pa.C.S. § 1102 (creating a safe harbor for "an action having a *de minimis* economic impact or which affects to the same degree of . . . a subclass consisting of an industry, occupation or other group which includes the public official or public employee, [or] a member of his immediate family").

establish by clear and convincing evidence that: (1) a public official (2) used the authority of his office (3) for the private pecuniary gain of himself, an immediate family member, or a business with which he is associated.[20] The court also cited this Court's holding that "a public official must be consciously aware of a private benefit for himself, his family, or his business, and then must take action in the form of one or more specific steps to attain that benefit."[21] The Commonwealth Court further observed that the Commission consistently has ruled that "use of authority" includes "discussing, conferring with others, and lobbying for a particular result."[22]

The court concluded that, "[r]egardless of whether Sivick's interaction with the other Supervisors about repealing the Nepotism Policy and hiring his Son were considered requests, recommendations[,] or veiled heavy-handed mandates, they were nevertheless made in his capacity as Board Chairman and Roadmaster."[23] Sivick's abstention from voting to remove the policy from the handbook did not vitiate his violation because Sivick "encouraged the other Supervisors to eliminate the Nepotism Policy so the Board could vote on his Son's hiring, and then lobbied the Township to hire his Son."[24]

After rejecting Sivick's challenges to the first and second grounds upon which the Commission based its finding of a conflict of interest violation, the court turned to Sivick's contention that the Commission erred in finding a separate violation in Sivick's verification

---

[20] *See Sivick*, 202 A.3d at 821.

[21] *Kistler v. State Ethics Comm'n*, 22 A.3d 223, 231 (Pa. 2011).

[22] *Sivick,* 202 A.3d at 823-24.

[23] *Id.* at 824.

[24] *Id.* at 825.

and approval of Son's payroll records. Sivick maintained that there was no evidence that Son received a private pecuniary benefit to which to he was not entitled or that Son was not a member of a subclass comprising individuals collectively subject to Sivick's supervision, such that his involvement in payroll approvals was excluded under the subclass exception in the definition of conflict of interest.

In this regard, Sivick relied upon the Commonwealth Court's decision in *Kraines v. State Ethics Commission.*[25] In *Kraines*, the Commonwealth Court overturned the Commission's adjudication that Kraines, a county controller, violated the Ethics Act by signing off on payments to her husband, a forensic pathologist, who provided autopsy and other services to the county on a contract basis. In finding no violation, the Commonwealth Court reasoned that Kraines' husband had performed autopsies in the county for years before Kraines became controller, and that Kraines had no role in either the coroner's decision to retain her husband or in setting her husband's compensation. The court distinguished Sivick's case, noting that "Sivick initiated the improper scheme to have the Township's Nepotism Policy repealed and his son hired."[26] In effect, the court commingled with the payroll-related activities what both the Commission—and, elsewhere, the court itself—had seemed to identify as discrete violations associated with Son's hiring.

Treating those violations as distinct, and relying upon a prior version of the conflict of interest provision, which stated that no public official shall use his office to "obtain

---

[25] 805 A.2d 677 (Pa. Cmwlth. 2002).

[26] *Sivick*, 202 A.3d at 825.

financial gain *other than compensation provided by law*,"[27] Sivick argued that no payroll-related violation occurred because Son's compensation, *qua* private pecuniary benefit, was duly earned. But the court rejected that argument, observing that the "current conflict of interest standard . . . makes any private pecuniary gain to a public official a violation, *whether or not such compensation is otherwise provided for by law*."[28]

The court also credited the Commission's reasoning that Sivick's actions were not broad conduct generally affecting all Township employees; rather, the review and approval of each employee's timesheet was distinct to the employee.[29] As such, relative to Sivick's payroll-related activities, each Township employee was a class of one, and each approval in some sense was an isolated conferral upon the employee of a private pecuniary benefit.

Finally, Sivick challenged the Commission's order requiring him to pay $30,000 in restitution to the Commonwealth, arguing that the Commission may order restitution only where a public official or public employee,[30] but not a third party, has obtained a financial

---

[27]     *See* 65 P.S. § 403(a) (repealed) (emphasis added).

[28]     *Sivick,* 202 A.3d at 826 (quoting *Snyder v. State Ethics Comm'n*, 686 A.2d 843, 853 n.16 (Pa. Cmwlth. 1996) (emphasis added in *Sivick*)).

[29]     *See id.* at 827 (citing Comm. Adj. at 22).

[30]     The Act defines "public employee" as:

Any individual employed by the Commonwealth or a political subdivision who is responsible for taking or recommending official action of a nonministerial nature with regard to:

(1) contracting or procurement;

(2) administering or monitoring grants or subsidies;

(3) planning or zoning;

gain, a term that the Act does not define.[31]  The Act provides, in pertinent part, that "[a]ny order resulting from a finding that a public official or public employee has obtained a financial gain in violation of this chapter may require the restitution plus interest of that gain to the appropriate governmental body."[32]  Because Son, who undisputedly was neither a public official nor a public employee, was the only individual who received a financial gain, Sivick contended that the Commission lacked authority to order restitution.

The panel disagreed with Sivick's interpretation, concluding that Subsection 1107(13)'s reference to "a finding that a public official or public employee has obtained a financial gain in violation of this chapter" must be read consistently with the definition of conflict of interest, which refers to financial gain "benefit[ting] the public official or public employee *[or] a member of his immediate family*."[33]  Any other interpretation, the court determined, "would be illogical and result in an inconsistent application of the

---

(4) inspecting, licensing, regulating or auditing any person; or

(5) any other activity where the official action has an economic impact of greater than a *de minimis* nature on the interests of any person.

The term shall not include individuals who are employed by this Commonwealth or any political subdivision thereof in teaching as distinguished from administrative duties.

65 P.S. § 1102.  In relevant part, a "public official" is defined as "[a]ny person elected by the public or elected or appointed by a governmental body or an appointed official in the executive, legislative or judicial branch of this Commonwealth or any political subdivision thereof."  *Id.*

[31]  Sivick does not challenge his status as a public official and/or a public employee under the Act.

[32]  *Id.* § 1107(13).

[33]  *Id.* § 1102 (emphasis added).

Ethics Act based solely upon who happened to benefit from the prohibited conduct."[34]

"[B]ecause [Son's] salary was a direct consequence of Sivick's use of his authority of office, it was financial gain in violation of [the Act] for which the Commission could order restitution."[35]

Sivick sought this Court's review, and we granted his petition as to two issues.[36] Both issues require this Court to interpret the Ethics Act.[37] Our task is a familiar one:

> The object of all statutory interpretation is to ascertain and effectuate the intention of the General Assembly, giving effect, if possible, to all provisions of the statute. In general, the best indication of legislative intent is the plain language of a statute. When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. Words of the statute are to be construed according to their common and approved usage.[38]

---

[34] *Sivick*, 202 A.3d at 830.

[35] *Id.* at 830 (cleaned up).

[36] The issues, which we rephrased for clarity, are:

1) Whether, under Section 1107(13) of the [Ethics Act], the State Ethics Commission, upon a finding that a public official or public employee violated the Act, has the authority to order restitution when the individual who obtained financial gain is not the public official or employee, but is an immediate family member of the public official or employee?

2) Whether the action of a public official or public employee reviewing and approving payroll records of a group of subordinate employees, one or more of whom is the public official's or employee's immediate family member, falls within the class/subclass exemption of the "conflict of interest" definition in the [Ethics Act]?

*Sivick v. State Ethics Comm'n*, 217 A.3d 182 (Pa. 2019) (*per curiam*).

[37] Statutory interpretation presents a question of law that we review *de novo* subject to a plenary scope of review. *Bowling v. Office of Open Records*, 75 A.3d 453, 466 (Pa. 2013).

[38] *Kistler*, 22 A.3d at 227 (cleaned up); *see generally* 1 Pa.C.S. §§ 1903, 1921.

In this case, the Act's plain language suffices to resolve both of the questions at issue.

We begin with the Commission's determination that Sivick's discrete act of verifying and approving Son's compensation amounted to a conflict of interest violation. As set forth above, the Ethics Act defines conflict of interest as follows:

> Use by a public official or public employee of the authority of his office or employment . . . for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated.[39]  The term does not include an action having a *de minimis* economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.[40]

Sivick argues that, in the chain by which Son was compensated for work he performed satisfactorily for compensation that was paid on the same rate schedule as applied to similarly-situated Township employees, Sivick performed precisely the same role vis-à-vis a subclass of Township employees.  By contrast, the Commission would have this Court treat Sivick as having performed his role toward each employee in isolation from the others, denying recourse to the subclass exception.

Sivick directs us to various stipulations describing the details of his role in reviewing and approving each employee's time sheets.  In sum, Sivick explains:

> For the 9 or so full-time employees assigned to the Public Works Department, including [Son], five factual, critical characteristics existed:

---

[39]    The Act does not define "private pecuniary benefit," but we considered what that term encompasses at length in *Commonwealth v. Veon*, 150 A.3d 435, 445-47 (Pa. 2016).  For present purposes, we assume *arguendo* that Son's receipt of fair compensation for services duly rendered qualifies as a "private pecuniary benefit" bestowed upon a member of Sivick's immediate family.

[40]    65 Pa.C.S. § 1102.

1. All of them were supervised by Sivick.

2. All worked a 40-hour workweek consisting of five (5), eight (8)[-]hour workdays which traditionally began on Monday and ended on Friday.

3. All were paid at rates set annually by the [Board], not Sivick individually.

4. All received the same benefits package fixed by the [Board].

5. All submitted timesheets allocating their full-time work hours or time off to Sivick, who then examined the same for accuracy and completeness and passed them along for additional checking by an administrative secretary and Secretary-Treasurer Rohner who then arranged for approval by the [Board] and direct deposit into the employees' respective bank accounts.[41]

The Commission does not dispute that Sivick's payroll-related activity is accurately described. The question is how best to characterize that activity.

Although the parties offer no decisional law from this Court elaborating upon the exception, and the Commission offers no case law at all, Sivick relies heavily upon the Commonwealth Court's well-reasoned opinion in *Kraines, supra*. As set forth above, County Controller Kraines' husband, who entered into a self-renewing annual contract with the approval of the county commissioners years before his wife became controller, was paid an annual retainer that covered certain services, but he was paid separately for autopsies and other services, which he billed at a rate originally set in the contract. As controller, Kraines' signature was required upon checks issued in payment of county bills, so she facilitated payments to her husband and other pathologists, all of whom were paid at the same rates. The Ethics Commission found that Kraines issued fifty-seven checks

---

[41]     Brief for Sivick at 19-20 (record citations omitted).

to her husband in violation of Subsection 1103(a), because her actions conferred a private pecuniary benefit upon her husband.[42]

On appeal, the *Kraines* court noted that to violate Subsection 1103(a) a public official or employee must "use" her public position to obtain the financial gain. Although the Ethics Act does not define "use," the Commonwealth Court relied upon *Kistler*, in which we held that "'[u]se' of public office requires action by a public official that in some way facilitates his receipt of compensation to which he is not entitled."[43] However, the *Kraines* court found no "use" in the facts before it. Kraines had no role in the coroner's decision to retain her husband and no involvement in the rate of payment. Like other contract pathologists, he was paid at a rate approved by the coroner, the county budget director, and the county commissioners. "While Kraines approved payments via her stamped signature on County checks to her husband for pathologist fees, such action in and of itself does not constitute an ethics violation as Dr. Hoffman was entitled to these fees."[44]

---

[42] The Commission found that no restitution was due and imposed no other penalty.

[43] *Kistler*, 22 A.3d at 229 (quoting *McGuire v. State Ethics Comm'n*, 657 A.2d 1346, 1351 (Pa. Cmwlth. 1995)); *see Kraines*, 805 A.2d at 681 (citing the same passage from *McGuire*); *see also Kistler*, 22 A.3d at 227 (Pa. 2011) (defining "use" for statutory purposes as "act[ing] in such a way as to put his office to the purpose of obtaining for himself a private pecuniary benefit," describing the act as one "directed toward [that] purpose").

Interestingly, in some sense our allusion in *Kistler* to "compensation to which he is not entitled" recalls the since-repealed version of the conflict of interest provision caveat, for "financial gain other than compensation provided by law," 65 P.S. § 403(a) (repealed), a provision that, as discussed *supra*, Sivick cited before the Commonwealth Court and the court rejected as irrelevant in light of subsequent amendments to the Act.

[44] *Kraines*, 805 A.2d at 681.

The reason for Sivick's reliance upon this case is obvious. Given the Board's role in setting compensation rates, its employment of an objective metric in doing so, the involvement of other officials in facilitating the Township payroll, and Son's entitlement to compensation for his work on the same terms as similarly-situated employees, Sivick contends that he did not *use* his office to benefit Son in verifying and approving the payroll.

To be sure, there are differences between this case and *Kraines*. In particular, the sum of Kraines' behavior in that case was clearly less blameworthy than was Sivick's in this case, where the Commission found other bases for violations in connection with Sivick's role in soliciting the elimination of the nepotism policy and the hiring of Son in the first instance. In those actions, Sivick plainly "used" his office to facilitate Son's private pecuniary benefit. Kraines' husband, on the other hand, had established himself as a contract pathologist to the county years before Kraines took office. But the issue as described by this Court in its order granting allowance of appeal and as argued by the parties implicates not the Commission's findings in sum, but the narrower question of whether Sivick's involvement in approving payroll, standing alone, violated Subsection 1103(a) simply because Son was a Township employee. With the question cabined in this way, there is very little daylight between this case and *Kraines*.

The Commission contends that Son's payment was based on his individual timesheet, which was examined for accuracy by Sivick in isolation from those of the others in his cohort, not as part of an activity directed at a subclass of Township employees as such. If we hold otherwise, the Commission suggests, "the class/subclass exception functionally loses its meeting. Before there can be a class/subclass exception there must

first be a class or subclass."[45] In this regard, the Commission proposes to distinguish these facts from a circumstance in which Sivick voted to provide an across-the-board pay raise to road crew workers as a class. While reviewing and signing off on timesheets was "similar" as to each employee, each approval affected only one person.[46]

The Commission's effort to treat each approval in isolation is strained and unconvincing. In confirming the hours worked and approving Son's compensation in the same compensation schedule and structure that applied to his cohort, Sivick did nothing more to *use* his office to benefit Son than Kraines did in approving a discrete payment to her husband for an autopsy that he performed. It is true that each approval, in some sense, is a discrete act, inasmuch as one can imagine that, detecting an anomaly, Sivick might decline to approve any one employee's compensation in a given period while approving the other employees' compensation. But the same was true in *Kraines*; any given payment to any given pathologist might not have been due, rendering each approval an independent act of sorts. Still, the compensation for work duly performed in *Kraines* was dictated by preexisting terms that applied uniformly to a class of contractors to which Kraines' husband belonged. The same is true here. Provided that members of the road crew put in their time, Sivick had no apparent discretion to deny payment at the Board-approved rate.

It is true that, in wielding his pen to authorize payment to Son while wearing his Township Supervisor hat, Sivick in some sense *used* his office to assure Son's receipt of money in the form of payroll. But the use in question lacked the affirmative character that

---

[45]    *See* Brief for the Commission at 19.

[46]    *See id.* at 19-20.

we described in *Kistler*. Had Sivick *only* been a member of the Board of Supervisors, and had he *only* solicited the repeal of the nepotism policy and Son's hiring, whoever else occupied the role of Supervisor/Roadmaster presumably would have authorized precisely the same payments to Son. In doing so, that hypothetical person would have understood his or her task to apply generally to the subclass of Township employees; indeed, one could imagine such a person citing as an excuse to escape a tedious conversation that he or she had to get back to the office to "do payroll."[47]

The Commonwealth Court's reasoning in *Kraines* is sound. The performance by a public officer or employee of an administrative or ministerial act entailing little or no discretion that benefits a subclass that includes an immediate family member does not, without more, constitute a conflict of interest violation. The narrow aspect of Sivick's Township employment that involved verifying hours worked by Public Works employees and approving their compensation applied collectively and equally to the subclass of employees, not to individuals as such. Accordingly, the subclass exception applied here, and we reverse the Commonwealth Court's contrary ruling.

---

[47] In this regard, it is worth noting that the apparent intent, or at least an incidental benefit, of the subclass exception is that, in requiring that the entire class including the public official's immediate family member be treated equally, it excludes from its protection any instance of preferential treatment of the family member by the official. As *Amicus Curiae* the Pennsylvania State Association of Township Supervisors explains on Sivick's behalf, mere approval of payroll on equal terms does not make every employee a class of one, but as soon as one member of the subclass receives preferential treatment, the cohort in question is no longer being treated as a class, and the proposition that each approval is a discrete rather than a subclass-directed act becomes true. *See* Brief of *Amicus Curiae* Pa. State Ass'n of Twp. Supervisors at 15. At no time has anyone suggested that Son received preferential treatment once he began his Township employment.

Next, we consider whether the Commission had authority to impose a restitutionary sanction, even though the disbursements associated with Sivick's conflict of interest violation ran solely to Son and undisputedly were earned and paid at a Board-approved rate on the same terms as all similarly-situated employees. The Ethics Act provides, in relevant part: "Any order resulting from a finding that a public official or public employee has obtained a financial gain in violation of this chapter may require the restitution plus interest of that gain to the appropriate governmental body."[48]

In full, the Commission explained the basis for its imposition of restitution as follows:

> The private pecuniary benefit [, *i.e.*, net compensation,] that [Son] received as a result of [Sivick's] violation of Section 1103(a) of the Ethics Act was $87,949.36. Although there is certainly a legal basis for imposing restitution in the amount of $87,949.36, we will, in the exercise of our discretion, limit the amount of restitution to be paid by [Sivick] to $30,000.00, with such restitution to be paid to the Pennsylvania Office of the State Treasurer, through this Commission, for deposit in the General Fund of the Commonwealth of Pennsylvania.[49]

The Commonwealth Court accepted the Commission's argument that Subsection 1107(13)'s use of "financial gain" must be informed, and effectively expanded, by the Act's definition of conflict of interest.

> This [c]ourt interprets Section 1107(13) of the Ethics Act consistent with Section 1102 of the Ethics Act, which defines "conflict of interest," in relevant part, as "[u]se by a public official or public employee of the authority of his office or employment . . . for the private pecuniary benefit of himself, [or] a member of his immediate family . . . ." 65 Pa.C.S. § 1102. Thus, the reference to "a finding that a public official or public employee **has obtained a financial gain in violation of this chapter**" in Section 1107(13) of the Ethics Act, 65 Pa.C.S. § 1107(13) (emphasis added), refers to a financial gain "benefit[ing the public official or employee], [or] a member of his immediate family[.]" 65 Pa.C.S. § 1102. Any other interpretation would be

---

[48]    65 Pa.C.S. § 1107(13).

[49]    Comm. Adj. at 23.

illogical and result in an inconsistent application of the Ethics Act based solely upon who happened to benefit from the prohibited conduct. . . . Had Sivick not engaged in the improper conduct, the Board would not have rescinded the Nepotism Policy or hired his Son. Because Sivick's Son's salary was a direct consequence of Sivick's use of his authority of office, it was "financial gain in violation of [the Ethics Act]" for which the Commission could order restitution.[50]

Before this Court, Sivick renews the plain language argument that the lower court rejected: Because Son was not a public official or public employee, and because he alone received a financial gain, restitution simply is not available. In importing the phrase "[or] a member of his immediate family" from the definition of conflict of interest into Subsection 1107(13) and adding it to the less expansive reference in that subsection to "public official or employee," the court committed the cardinal sin of adding language that the legislature presumably omitted deliberately.[51]

We agree with Sivick. As always, our interpretive function requires us to identify the intent of the legislature, and we begin with the presumption that unambiguous statutory language embodies that intent, requiring no further investigation. We may not disregard the Act's unambiguous language in service of what we believe to be the spirit

---

[50]     *Sivick*, 202 A.3d at 830.

[51]     *Cf. Burke ex rel. Burke v. Ind. Blue Cross*, 103 A.3d 1267, 1274 (Pa. 2014) (referring to "the precept that courts cannot insert words into a statute"). Interestingly, in *Burke* we found a "rare case in which the plain text of an unambiguous statute does not appear to be the best indication of legislative intent." *Id.* The statutory language was clear, but it created "an asymmetry stemming from an apparent legislative oversight." *Id.* at 1273. Even so, we underscored that such an asymmetry, even a critical one, does not constitute ambiguity as such. And in fashioning a remedy, we took care not to simply rewrite the statute.

of the law.[52] Furthermore, while we must consider the statutory language in its full context before we assess ambiguity,[53] we must not overlabor to detect or manufacture ambiguity where the language reveals none.[54] And in any event, neither party suggests that the Act is ambiguous in this connection; they simply differ as to the putative thrust of the Act's terms. While this might suggest the presence of two reasonable interpretations, signaling ambiguity,[55] we do not believe the Commission's interpretation is reasonable.

It is axiomatic that we may not add statutory language where we find the extant language somehow lacking:

> Under the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters. Similarly, this Court has long recognized that as a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says[,] one must also listen attentively to what it does not say.[56]

---

[52] *See* 1 Pa.C.S. § 1921(b); *Koken v. Reliance Ins. Co.*, 893 A.2d 70, 82 (Pa. 2006) ("Where it is unambiguous, the plain language controls, and it cannot be ignored in pursuit of the statute's alleged contrary spirit or purpose.").

[53] *See A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016) (citing *King v. Burwell*, 576 U.S. 473, 486 (2015)) (advising that "we should not interpret statutory words in isolation but must read them with reference to the context in which they appear," and endorsing the United States Supreme Court's "contextual approach in assessing statutes and in determining predicate ambiguity"); *see also King*, 576 U.S. at 486 ("So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions." (cleaned up)).

[54] *See Commonwealth v. Office of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014) (rejecting an argument in support of ambiguity that "improperly" viewed the language in question "in isolation," rather than reading it "in conjunction with the rest of the statute," which revealed unambiguous textual evidence of the legislature's intent).

[55] *See Commonwealth v. McClelland*, ___ A.3d ___, 2020 WL 4092109, at *12 (Pa. July 21, 2020) ("A statute is ambiguous when there are at least two reasonable interpretations of the text.").

[56] *Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020) (cleaned up); *see Discovery Charter Sch. v. Sch. Dist. of Phila.*, 166 A.3d 304, 321 (Pa. 2017) (finding

"[T]he court may not supply omissions in the statute when it appears that the matter may have been intentionally omitted."[57]  The language the Commission would have us read by implication into Subsection 1107(13)—"or a member of his immediate family member"—specifically appears in Section 1102, signaling that, in fashioning the Act, the General Assembly was both conscious of a distinction between public officials and employees and their immediate families *and* aware that among the ways a public official or employee might seek to benefit would be to divert a private pecuniary benefit to others close to them.  That Subsection 1107(13) did not expressly provide for restitution where a public official or employee confers a financial benefit upon an immediate family member leads us to conclude that the legislature did not intend to make restitution available under that circumstance.

Against this conclusion, the lower court suggests that the legislature would have intended that the additional language of the definition of conflict of interest concerning immediate family members be read into the restitutionary provision because to do otherwise would be "illogical."  It is not our role to improve upon the logic of complex statutory schemes like the Ethics Act or to identify and rectify every apparent inconsistency in an effort to make the Act appear more logical by our measure.

In defining conflict of interest to apply where, by official act, a public official or public employee confers a private pecuniary benefit upon himself *or* a member of his immediate

---

probative of legislative intent the absence of a provision from one section that correlated with an express provision in another and observing that "[w]e cannot ignore this Legislative silence because when interpreting a statute, we must listen attentively to what the statute says, but also to what it does not say" (internal quotation marks omitted)).

[57]     *Commonwealth v. Spotz*, 716 A.2d 580, 590 (Pa. 1998).

family, the General Assembly signaled that it did not believe immediate family members to be implied by the mere reference to a public official or public employee.[58] It would require quite a leap to conclude that, just five sections later in the same Act, the legislature thought it so obvious that restitution should be available for a public official's conferral of a benefit upon his immediate family member that the latter scenario need not be spelled out separately as a basis for restitution. In the above-excerpted passage of its opinion, the lower court suggests with bracketed language that it merely substituted one term's definition for a later usage of that term, but that simply is not the case. In fact, the court *added* language from the definition of conflict of interest, importing that definition's use of "immediate family" to the restitution provision, which conspicuously lacks that term. There is no direct textual indication that the legislature intended to expand *sub silentio* the class of beneficiaries whose financial gain might trigger restitution.

We do not disagree with the Commonwealth Court that the Act, so understood, creates a risk of inconsistent application. But to call it "illogical" overstates the case. The General Assembly might rationally have concluded that restitution should be among the available sanctions when the moneys diverted were retained or used directly by the offender, while choosing not to authorize such a sanction when diversion to a third (and blameless) party would create the risk of complications exceeding the benefit to be gained, or, alternatively, was perceived as less blameworthy than an official lining his or

---

[58]     *See* 1 Pa.C.S. §§ 1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."), 1922(2) (providing that courts may presume "[t]hat the General Assembly intends the entire statute to be effective and certain"); *see also Ind. Oil & Gas Ass'n v. Bd. of Assessment*, 814 A.2d 180, 183 (Pa. 2002)) ("[B]ecause the legislature is presumed to have intended to avoid mere surplusage, every word, sentence, and provision of a statute must be given effect.").

her own pockets. Notably, the Commission has other arrows in its quiver for sanctioning and deterring Conflicts of Interest. A conflict of interest violation is a felony, and it is punishable by imprisonment of up to five years and a fine of up to $10,000.[59] In any event, where the language is clear, any further inquiry into or speculation regarding the legislature's overarching vision for the Act is gratuitous.

In providing that a restitution award may be imposed upon a "public official or public employee [who] has obtained a financial gain in violation of" the Act, the General Assembly used common terms in a clear way, terms that it saw fit to modify to expand the class in defining conflict of interest but not to expand in connection with restitution. Hewing to the statutory language, we hold that restitution under the Ethics Act may be imposed only upon public officials and employees who themselves gain financially by violating the Ethics Act, not upon those who divert improperly obtained moneys to members of their immediate families.[60] Accordingly, we reverse the Commonwealth Court's contrary conclusion.

Having established that one of the three stated bases for the Commission's finding that Sivick violated Subsection 1103(A) of the Act is infirm *and* that the Commission

---

[59] *See* 65 Pa.C.S. § 1109(a). Interestingly, Subsection 1109(c) provides for treble damages as follows: "Any person who obtains financial gain from violating any provision of this chapter, in addition to any other penalty provided by law, shall pay a sum of money equal to three times the amount of financial gain resulting from such violation . . . ." Once again, the Act imposes a financial penalty on a person "who obtains" a financial gain from his or her wrongdoing, and once again makes no reference to other potential third-party beneficiaries of the impropriety.

[60] We offer no opinion regarding which side of the line drawn in this case might lie a "business with which [a public official or public employee] . . . is associated," which, given the more direct connection to the presumptive interests of the public official or public employee, may warrant separate consideration in a suitable case.

lacked statutory authority to impose restitution under the circumstances of this case, we now must address how to proceed on remand. Although conflict of interest is a felony, the Commission's approach to this case was not like a conventional criminal matter, which typically proceeds by reference to individual counts as to each of which a defendant is convicted or acquitted, with certain potential penalties attaching to each conviction. By contrast, the Commission's adjudication identified three distinct but interrelated actions as violating Subsection 1103(a) without making clear whether each cited basis was sufficient by itself, or whether the violation was based upon aggregating the cited wrongdoing into one course of conduct.[61] This creates a degree of uncertainty that is only exacerbated by the Commission's imposition of a single sanction. It is exacerbated further still, now, by this Court's determination that the lone sanction imposed lacked a statutory basis—and was, in a sense, an illegal sentence. The parties do not address this complication, which was immaterial to the court below because it affirmed the Commission's Adjudication.

When an appellate court invalidates any among a number of convictions in a given case, or otherwise deems invalid any component of a sentencing scheme in such a matter, we assume that the court, having imposed sentence with an overarching understanding of the aggregate sanction, should have the opportunity to fashion a new

---

[61]  *See* Comm. Adj. at 22 (ruling that Sivick violated Subsection 1103(a) of the Act "when he participated in discussions and actions of the Board to eliminate the Township's Nepotism Policy with the intent and for the purpose of having his son hired as a Township road crew employee; when he discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of his son as a Township employee; and when he verified Township records enabling and/or otherwise directing the payment of salary/wage to his son from public monies").

judgment of sentence.[62]  Here, it isn't even entirely clear that the Commission would have found a conflict of interest violation at all without one of its three cited bases for the violation deemed invalid.  But even if the Commission sustains its finding of a conflict of interest violation on the cited bases that remain undisturbed by our ruling, it may well wish to consider alternative sanctions available to it under Section 1109 of the Act.[63]  That is the Commission's decision to make on remand.

We reverse the Commonwealth Court's decision and vacate the Commission's Adjudication.  We remand for further proceedings consistent with this Opinion, including, in the Commission's discretion, the entry of a new adjudication and, if it deems appropriate, the imposition of any sanction available under the Act.

Chief Justice Saylor and Justices Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Baer concurs in the result.

---

[62]     *See generally Commonwealth v. Goldhammer*, 517 A.2d 1280, 1283 (Pa. 1986) (noting that 42 Pa.C.S. § 706 authorizes an appellate court to remand for further proceedings consequent to the reversal of a trial court's order, including sentencing, especially when the appellate ruling "alter[s] the [court's] sentencing scheme"); *Commonwealth v. Thur*, 906 A.2d 552, 569 (Pa. Super. 2006) ("If our disposition upsets the overall sentencing scheme of the trial court, we must remand so that the court can restructure its sentence plan.").

[63]     *See* 65 Pa.C.S. § 1109.